# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Records and information associated with the cellular device assigned call number number 414-850-1859 (Target Cell Phone), that is in the custody or control of Verizon, further described in Attachment A

Case No. 26-880M(NJ)
Matter No. 2024R438

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ________ District of ________
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 4/24/2026 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Nancy Joseph.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ☑ until, the facts justifying, the later specific date of 04/29/2026.

Date and time issued: 4/10/2026 @ 4:27 p.m.

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| --- | --- | --- |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

## <u>ATTACHMENT A</u>
**Property to Be Searched**
**MATTER NUMBER 2024R438**

1. Records and information associated with the cellular device assigned telephone number **414-850-1859** ("**Target Cell Phone 2**"), whose service provider is Verizon (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 1095 Avenue of the Americas, New York, NY 10036.

2. **Target Cell Phone**.

## ATTACHMENT B
**Particular Things to be Seized**
**MATTER NUMBER 2024R438**

### I. Information to be Disclosed by the Service Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone** for the period from October 1, 2025, to present:

   i. Names (including subscriber names, usernames, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long-distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phone**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from the **Target Cell Phone** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone** will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **Target Cell Phone**.

c. Information about the location of the **Target Cell Phone** for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall

compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

**II.** This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**III. Information to be Seized by the Government**

All information described above in Section I that constitutes evidence and instrumentalities of d distribution and possession with intent to distribute controlled substances, conspiracy to distribute and possess with the intent to distribute controlled substances, and use of a communications facility to facilitate a drug-trafficking offense, violations of Title 21, United States Code Sections 841(a)(1), 843, and 846 (Target Offenses), have been committed by George C. MCFARLAND (XX/XX/XX84), and other known and unknown individuals during the period of October 1, 2025 to present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Records and information associated with the cellular device assigned call number number 414-850-1859 (Target Cell Phone), that is in the custody or control of Verizon, further described in Attachment A

Case No. 26-880M(NJ)

Matter No. 2024R438

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ______________ District of ____________________, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. Secs. 841, 843, and 846 | Conspiracy to distribute and possess with the intent to distribute controlled substances; Distribution and possession with intent to distribute controlled substances; Use of a communication facility to facilitate a drug trafficking offense. |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of ____ days *(give exact ending date if more than 30 days:* 04/29/2026 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

USPIS TFO Mitchell Ward

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 4/10/2026

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**Matter No. 2024R00438**

I, Mitchell WARD, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **414-850-1859 (Target Cell Phone)**, whose service provider is Verizon ("Service Provider") a wireless telephone service provider headquartered at 1095 Avenue of the Americas, New York, NY 10036. The **Target Cell Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. In this application, the United States seeks (1) historical cell-site location information; (2) historical precision location information; (3) prospective, real-time cell-site location information; (4) prospective, real-time precision location information (i.e., E-911 Phase II data and GPS); and (5) subscriber information and other historic non-content records and information.

3. Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application(s) by the United States of America for an order(s) pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing,

routing, addressing, and signaling information associated with each communication to or from the **Target Cell Phone**.

4. I am a state certified law enforcement officer employed as a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation, (DCI) and have been a sworn officer in the State of Wisconsin for over 33 years. I am currently assigned to DCI's Milwaukee Field Office, Narcotics Bureau. I am also a federally deputized task force officer for the United States Postal Inspection Service ("USPIS"). As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

5. As a federal task force officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have also spoken on numerous occasions with other experienced narcotics investigators, both foreign and domestic, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses which specialized

in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

6. I have participated in complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. More specifically, my training and experience includes the following:

a. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b. I have experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

c. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

d. I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations. I am familiar with the language utilized over the telephone or other communication applications to discuss drug trafficking, and know that the language is often limited, guarded, and coded. Additionally, I know that drug traffickers often change their phone numbers and cellular devices on frequent basis in an attempt to thwart law enforcement from tracking their phones and to conceal their identity.

e. I know that drug traffickers commonly have in their possession, and at their residences and other locations ("stash houses") where they exercise dominion and control, controlled substances, firearms, ammunition, drug proceeds, and records or receipts pertaining their drug trafficking;

f. I know that drug traffickers used what is refer to as a "stash house" to stow illegal items such as illegal controlled substance, packaging paraphernalia, illegal firearms, ledgers, and US currency. Often times members of drug trafficking organizations have to make stops at the stash locations to pick up illegal controlled substance to deliver. Additionally, drug traffickers will have customers meet drug traffickers near the stash location. Multiple stops can be made in a day at these locations. This is done so the trafficker does not have to carry additional illegal controlled substances in their vehicle or person or maintain them at their residence. This protects the trafficker from law enforcement investigations as they do not have illegal controlled substances on them after the delivery is made or inside their personal residence. Often time the US currency will be transported after the delivery to the stash house to protect against law enforcement investigation and rival drug trafficker's robbery crews.

g. I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate drug trafficking; and

h. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials.

7. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my

investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

8. Based on my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as a confidential source (CS), purchases drugs from a target at the direction of law enforcement. For the below outlined controlled buys, the operations were generally conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CS was used, she/he was searched for contraband, weapons, and money before the operation. The CS was also wired with a concealed body recorder and/or a monitoring device. When the transaction was completed, the CS met cases agents at a pre-determined meet location and gave the purchased drugs and the recording/monitoring equipment to the case agents. The CS was again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction and CS's information is verified. A sample of the suspected drugs was then field tested by the case agents for the presumptive presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. Further, often the calls to the target by the CS, which were consensually recorded calls, were done under the direction and control of case agents and/or made in the presence of case agents.

9. The facts in this affidavit come my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; (c) court-authorized electronic communications; and (d) information obtained from cooperating citizen witnesses, confidential sources, and defendants, whose reliability is established herein. This affidavit is intended to show

merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

10. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

11. Based on the facts set forth in this affidavit, there is probable cause to believe that the crimes distribution and possession with intent to distribute controlled substances, conspiracy to distribute and possess with the intent to distribute controlled substances, and use of a communications facility to facilitate a drug-trafficking offense, violations of Title 21, United States Code Sections 841(a)(1), 843, and 846 (Target Offenses), have been committed by George C. MCFARLAND (XX/XX/XX84), and other known and unknown individuals. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

## JURISDICTION

12. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

13. I am currently participating in an investigation of cocaine and fentanyl trafficking, and possession of a firearm in furtherance of drug trafficking involving George C. MCFARLAND, Jesse KINDT (DOB:XX/XX/1989), Kurtis CLINE (DOB:XX/XX/1983), Michael LIPSEY

(DOB:XX/XX/1974) and other known and unknown individuals. Investigator Luke Linsmeyer of the Oneida County Sheriff's Office, assigned to the North Central Drug Enforcement Group, began this investigation and has requested assistance from SA Ward. SA Ward is familiar with the facts and circumstances regarding this investigation as a result of SA Ward's personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; (c) information obtained from numerous witnesses, including confidential sources; (d) controlled buys; (e) documentary evidence; (f) physical and electronic surveillance; and (g) physical seizures.

14. Case agents identified CLINE and KINDT as a fentanyl dealers being supplied by MCFARLAND. On December 12, 2025, Investigator Linsmeyer was reviewing CLINE's cell phones number 715-499-4034 call detail activity pursuant to a state authorized Trap and Trace Warrant. In reviewing this data, Investigator Linsmeyer identified CLINE to make an outgoing phone call to the phone number at approximately 9:22 am. Investigator Linsmeyer utilized multiple law enforcement databases and identified the phone number **414-850-1859** (**Target Cell Phone**) belonging to a George C. MCFARLAND (M/B XX-XX-XX84).

15. Investigator Linsmeyer also knows the phone number **414-850-1859** (**Target Cell Phone**) was in a cellular phone extraction from KINDT'S phone in October of 2025. Base don review of phone extractions, Investigator Linsmeyer knows through the course of this investigation that KINDT had previously instructed CLINE to travel to the Milwaukee area and purchase fentanyl on KINDT's behalf. Specifically, Investigator Linsmeyer knows KINDT provided the money to CLINE in which CLINE would purchase approximately 50 grams of fentanyl in Milwaukee and transport the fentanyl back to the Oneida County area. Investigator Linsmeyer

knows CLINE completed this transaction on two separate occasions in which CLINE brought 50 grams of fentanyl back to Onedia County on both occasions.

16. On December 12, 2025, at approximately 1:21 pm, Investigator Linsmeyer observed court authorized electronic surveillance of CLINE's cell phone 715-499-4034 travelling south on US HWY 51 near the Irma Wisconsin area. Investigator Linsmeyer continued to monitor the court authorized electronic surveillance of CLINE's cell phone 715-499-4034, to which Investigator Linsmeyer was able to track CLINE's cell phone 715-499-4034 continuing traveling south towards the Milwaukee area. Based on the prior investigation, CLINE's cell phone 715-499-4034 being in contact with MCFARLAND's number **414-850-1859 (Target Cell Phone**), and CLINE appearing to be travelling to the Milwaukee area, Investigator Linsmeyer believed CLINE was traveling to Milwaukee area to obtained controlled substance and anticipated CLINE would arrive around 4:30 pm. Investigator Linsmeyer utilized other investigative resources and identified CLINE to be operating a silver 2010 Jeep Wrangler, bearing Wisconsin license plate AYY-6355 (Jeep). Investigator Linsmeyer observed that the Jeep appeared to be traveling in the same area of CLINE's cell phone 715-499-4034.

17. Investigator Linsmeyer obtained a signed state search warrant for the Jeep by a judge at the Onedia County Courthouse.

18. Investigator Linsmeyer identified the Jeep to be traveling to the Potawatomi Casino in the city of Milwaukee. Case agents observed the Jeep parked and unoccupied inside the parking garage of the casino. Case agents also observed a black Dodge pickup truck, bearing Wisconsin license plate JG5391 (Dodge) parked in the structure. Case agents reviewed Wisconsin Department of Transportation records and identified MCFARLAND as the registered owner of the Dodge. Case agents observed the Jeep leave Potawatomi Casino and travel from the Milwaukee

area. The Jeep ultimately stopped at a *La Quinta* hotel in Oshkosh, Wisconsin. The Jeep remained at *La Quinta* hotel overnight from December 12 until December 13, 2025. Investigator Linsmeyer then identified the Jeep to be leave the Oshkosh area at approximately 11:40 a.m., on December 13, 2025.

**Arrest of Kurtis CLINE and Keeley HILL**

19. On December 13, 2025, Investigator Linsmeyer along with other case agents attempted to stop the Jeep in Onedia, Wisconsin. As Investigator Linsmeyer activated siren and emergency lights on the police vehicle, the Jeep continued to travel at approximately 70 mph for approximately one hundred fifty yards. Investigator Linsmeyer observed the Jeep to attempt to quickly turn into a driveway off Boyce Drive. As the Jeep was turning into the driveway, Investigator Linsmeyer observed the Jeep miss the driveway and almost traveled into the ditch. As Investigator Linsmeyer approached the Jeep at a high rate of speed, Investigator Linsmeyer observed the Jeep's reverse lights turn on. Investigator Linsmeyer believed the Jeep was attempting to elude investigators, so Investigator Linsmeyer drove directly behind the Jeep eventually stopping the Jeep's movement and not allowing the Jeep to continue to elude or flee.

20. The Jeep was driven by CLINE. Additionally, Keeley Marie HILL (DOB:XX-XX-1997) was the only passenger at the time of the stop. Case agents conducted a search of Jeep pursuant to a state search warrant and recovered: 0.9 grams of suspected crack cocaine; approximately 2 grams of suspected marijuana; a digital scale with suspected cocaine residue; a syringe containing an unidentified clear liquid; and other items of drug paraphernalia.

21. Case agents interviewed Keeley HILL regarding this investigation. HILL stated that she and CLINE traveled to Potawatomi Casino on December 12, 2025. When they reached the casino, they met with a black male in the parking garage. HILL and CLINE got into a Dodge

Ram pickup truck that the unknown black male was operating. At this time CLINE purchased $1,500 worth of fentanyl from the black male. HILL stated that the unknown own male also gave give a small amount of crack cocaine. Afterwards, HILL and CLINE spent some time in the casino before leaving the Milwaukee area. HILL provided a physical description of the subject CLINE purchased the fentanyl from, which case agents observed was consistent with the physical description of MCFARLAND.

22. HILL further stated that she and CLINE spent the night of December 12, 2025, in Oshkosh before returning to Onedia County. When HILL and CLINE were in Onedia County, Hill stated that CLINE told her they were "getting pulled over." HILL stated that as CLINE was attempting to pull into a driveway, CLINE was hanging out of the driver's side window and was throwing the fentanyl into the woods area of the driveway.

23. On December 14, 2025, Investigator Linsmeyer, Horwath, Brown and K9 Odin began looking for the fentanyl in the described location. Investigator Linsmeyer ultimately located a purplish in color substance located in a plastic bag with the corner cut. Investigator Linsmeyer believed the substance was likely fentanyl. Based on the amount HILL discussed CLINE paying to MCFARLAND for the controlled substances, investigators believe there may have need additional amounts of fentanyl also in the area. Investigator Linsmeyer and Horwath were unable to locate the remaining fentanyl that was described to be in the ditch area at that time. The purple substance field-tested positive for the presence of fentanyl with an approximate weight of 3.3 grams.

24. On December 14, 2026, CLINE provided a *Mirandized* statement. CLINE acknowledged that he contacted "George" at 414-850-1859 (**Target Cell Phone**) to purchase fentanyl in Milwaukee, Wisconsin. CLINE provided consent for case agents to search his

cellphones. Case agents observed a contact in CLINE'S phone of "George" and telephone number "**414-850-1859**" (**Target Cell Phone**). CLINE stated that the transaction took place in a black Dodge pickup truck, parked in the parking garage of the Potawatomi Casino in Milwaukee. CLINE stated that he contacted "George" by phone prior to coming to the Milwaukee area. "George" told CLINE to meet him at the casino. CLINE stated that he received a text message from "George" alerting CLINE that he was at the casino. CLINE stated that he was introduced to "George" by Jessie KINDT and has picked up fentanyl in Milwaukee from "George" on behalf of KINDT as well as himself. CLINE has purchased fentanyl from "George" over six times in Milwaukee during the past six months. CLINE stated that he has picked up as much as 28 grams of fentanyl from "George."

**Traffic stop of George MCFARLAND**

25. On December 23, 2025, Greenfield Police Officer conducted a traffic stop of MCFARLAND in Greenfield, Wisconsin. MCFARLAND was operating a black 2014 Dodge Ram pickup truck, bearing Wisconsin license plate of JG5391 (Dodge). MCFARLAND is the listed owner of the Dodge and was the sole occupant at the time of the stop. MCFARLAND provided the officer **414-850-1859** (**Target Cell Phone**) as his contact number.

**Daniel BOCK and MCFARLND Milwaukee meet**

26. Based upon call detail records obtained by Investigator Linsmeyer, the investigation into MCFARLAND and others, and law enforcement flock cameras, case agents determined that Danel BOCK was traveling from Onieda County towards the Milwaukee area in a 2015 Ford Explorer, bearing Wisconsin license plate AVD8943 (Explorer). BOCK was in contact with MCFARLAND's telephone **414-850-1859** (**Target Cell Phone**). Case agents located BOCK and Stacy RIDGEWAY in Waukesha County. Case agents observed RIDEWAY was

operating the Explorer and BOCK was in the passenger seat.. Case agents followed the Explorer to a service station in the 500 block of North 76th Street, Wauwatosa, Wisconsin. Case agents observed MCFARLAND arrive at the station in a black Charger, bearing Wisconsin license plate AKJ 1315 (Charger), with a white male passenger later identified as Richard STAMPFEL. Case agents observed STAMPFEL walk over to the Ford Explore and get into the backseat at the same time BOCK got into the backseat. STAMPFEL remained inside the Ford for approximately two minutes before returning to MCFRALRD's Charger. .  Based on training and experience, this encounter was consistent with a drug transaction. After the suspected drug transaction, the Charger made an abrupt U-turn and left the area.

27. Investigator Linsmeyer obtained a state search warrant for BOCK'S Ford Explorer (WI AVD8943) but were unable to serve it due to the Ford Explorer (WI AVD8943) breaking down in Milwaukee, and it was days before BOCK made it back in a Ford Explorer (WI AVD8943).

**Controlled Purchase from George MCFARLAND**

28. On February 18, 2026, case agents conducted a controlled purchase of fentanyl and cocaine base from MCFARLAND. Case agents met with CS-1 prior to the controlled buy. CS-1 was searched and no contraband was round. Under the direction of case agents, CS-1 made a consensually recorded call to MCFARLAND's telephone **414-850-1859** (**Target Cell Phone**). MCFARLAND told CS-1 to meet him at the Walgreens near South 6th Street and West Oklahoma Ave, Milwaukee, Wisconsin. Case agents provided CS-1 with a recording device and investigative funds. Case agents then drove CS-1 to the parking lot of the Walgreens located at 620 West Oklahoma Avenue.

29. Prior to CS-1's arrival, case agents conducting surveillance observed MCFARLAND parked in the lot sitting in the driver's seat of his Dodge. At approximately 2:17pm, case agents parked to the north of the Dodge and recognized MCFARLAND as the driver. CS-1 then exited the auto and got into the Dodge. A few moments later, CS-1 returned to case agents' auto and turned over two plastic bags with suspected controlled substances. One contained suspected cocaine base and the other suspected fentanyl. Case agents then left the area and surveillance was ended. CS-1 stated that while inside of MCFARLAND's Dodge, CS-1 purchased both suspected fentanyl and cocaine base from MCFARLAND.

30. Case agents field tested the suspected fentanyl and received a positive indication for the presence of fentanyl with a weight of 1 gram. Case agents also tested the suspected cocaine base and received a positive indication for the presence of cocaine with a weight of 8 grams. Additionally, case agents reviewed the recording of the controlled buy from MCFARLAND and found it to corroborate CS-1's account of what took place.

31. CS-1's information is credible and reliable because CS-1 has given information concerning individuals involved in illegal activities. CS-1's information has been independently verified through this investigation, including through controlled drug buys, queries of law enforcement databases, and surveillance. CS-1 has made statements against his/her penal interests. CS-1 has no felony convictions. CS-1 has one open felony matter in the states of Wisconsin for possession of narcotics. CS-1 has no arrests or convictions relating to dishonesty. CS-1 is cooperating with law enforcement for judicial consideration.

**Arrest of LIPSEY and Search Warrant at 2319 West Michigan St, Apt 101**

32. On March 4, 2026, case agents coordinated an arrest operation for LIPSEY. At approximately 12:24 pm, LIPSEY was arrested for a warrant with Racine County outside 2319

West Michigan Street, Milwaukee, Wisconsin. LIPSEY identified his apartment as #105 and denied having control of apartment # 101. LIPSEY provided investigators with verbal consent to search apartment #105 and provided keys to #105 and (later determined) keys to apartments 206 and 101.[1] On LIPSEY's persons, case agents located set of keys (LIPSEY's right hand), wallet with content (LIPSEY's right rear pants pocket), and single Key that opened apartment #101 (tucked inside LIPSEY's black wallet); and cellphones.

33. Upon entering apartment #105, it did not appear LIPSEY resided in apartment # 105. LIPSEY denied controlled or apartment # 101 and refused to provide consent. Investigators utilized LIPSEY's keys (from his person) and opened apartment # 101, to conduct a sweep of the apartment in fear it was occupied and to prevent the destruction of evidence. During this sweep for persons at 2319 West Michigan Street, Apartment # 101 Milwaukee, Wisconsin, case agents observed items consistent with drug trafficking in plain view:

- box of baking soda (cooking agent for cocaine base);
- latex gloves;
- box of sandwich baggies, Social Security card for LIPSEY;
- commercial pesticide card for LIPSEY on the bed;
- small caliber handgun on a nightstand in the bedroom;
- extended magazine on the floor adjacent to the bed;
- digital scale;
- plastic baggie with suspected marijuana; and
- Tupperware (clear) containing baggie with suspected crack cocaine.

34. LIPSEY is a convicted felon and prohibited from possessing firearms. Based on the items viewed in plain view, case agents obtained a state search warrant for 2319 West Michigan Street, Apartment # 101 Milwaukee, Wisconsin. Case agents located the following items:

[1] Based on the investigation and surveillance of LIPSEY, case agents had no information connecting LIPSEY to apartment 206, so the decision was made to not search that location.

- a silver and black Taurus semi-automatic handgun, bearing serial number AEG507832,
- a G3C, 40 caliber Smith and Wesson, loaded with magazine with ammunition, located on nightstand, west of bed, in bedroom;
- a black 40 caliber extended magazine, loaded with ammunition, located on floor next to Aero bed in bedroom;
- 28.04 grams of suspected crack cocaine, inside knotted plastic sandwich baggie, located in clear tupperware with blue lid on floor next to bed in bedroom;
- 7.50 grams of suspected crack cocaine, in knotted plastic sandwich baggie, located inside clear tupperware with blue lid on floor next to bed in bedroom;
- 7.50 grams of suspected crack cocaine, in knotted plastic sandwich baggie, located inside clear tupperware with blue lid on floor next to bed in bedroom;
- 7.09grams of suspected cocaine, in knotted plastic sandwich baggie, located inside clear tupperware with blue lid on floor next to bed in bedroom;
- 3.39 grams of suspected methamphetamine (crystalline), in knotted plastic sandwich baggie, located inside clear tupperware with blue lid on floor next to bed in bedroom;
- 9.06 grams of suspected crack cocaine, in clear square container with white lid on table near south wall in bedroom;
- 8.72grams of suspected crack cocaine, in clear round container with white lid, located on table near south wall in bedroom;
- 16.42 grams of suspected marijuana, in knotted plastic sandwich baggie, located on glass table near south wall in bedroom;
- A black/orange WeighMax digital scale located on glass table near south wall in bedroom'
- a razor blade and small spoon located inside clear tupperware with blue lid, which contained cocaine and methamphetamine, on floor next to bed in bedroom; and
- Multiple photographs of LIPSEY located on top of TV stand, closed and stacked, along north wall in living room.

35. LIPSEY was in possession of a cell phone with the number 414-366-7514. During a review of LIPSEY's phone extraction pursuant to a search warrant, case agents discovered numerous text messages between LIPSEY and MCFARLAND **414-850-1859 (Target Cell Phone**). Based on my training, experience, and the investigation into MCFARLAND and others, these text messages are consistent with drug trafficking, they often discuss pricing and locations to meet.

36. On March 11, 2026, case agents spoke with CS-1 regarding MCFARLAND. CS-1 stated that MCFARLAND has been in contact with CS-1 and stated that MCFARLAND sent text messages from **414-850-1859 (Target Cell Phone**) to CS-1 offering to sell cocaine base and fentanyl to CS-1. CS-1 provided screenshots of these messages to case agents.

37. On March 28, 2026, case agents was contacted by CS-1 regarding MCFARLAND. CS-1 stated that MCFARLAND was recently "ripped off" during a drug deal and is currently experiencing a cash shortage. Based on my training and experience, I believe this to mean that someone either sold bad controlled substances to MCFARLAND, obtained controlled substances from MCFARLAND and has not provided MCFARLAND for the controlled substance, or MCFARLAND's cash and/controlled substances were stolen by an unknown person. CS-1 stated that MCFARLAND is still using the**414-850-1859 (Target Cell Phone**) as of this date.

38. Case agents reviewed a reliable law enforcement database, which indicated that telephone number **414-850-1859** (**Target Cell Phone)'s** service provider is Verizon Wireless.

39. I believe that MCFARLAND is currently utilizing the **414-850-1859** (**Target Cell Phone)** to further MCFARLAND's drug trafficking and other criminal activities, including communicating with known and unknown co-conspirators. Further I believe MCFARLAND and other known and unknown co-conspirators, has made and will continue to make frequent visits to locations in which controlled substances are stored and distributed and/or pick up drug proceeds or location including likely meeting drug sources. Case agents believe that the historical and prospective monitoring of the **Target Cell Phone's** location will assist in identifying potential other sources of supply, distributors, and locations associated with MCFARLAND and others engaged in drug trafficking offenses.

## TECHNICAL BACKGROUND

40. Case agents believe the **Target Cell Phone,** whose service provider is Verizon ("Service Provider"), a wireless telephone service provider, continues to contain valuable information on this account that could be used as evidence for the of drug trafficking, distribution and possession with intent to distribute controlled substances, conspiracy to distribute and possess with the intent to distribute controlled substances, and use of a communications facility to facilitate a drug-trafficking offense, violations of Title 21, United States Code Sections 841(a)(1), 843, and 846 (Target Offenses), have been committed by MCFARLAND, and other known and unknown individuals.

41. Based on my training and experience, I know that Service Provider can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of the **Target Cell Phone**, including by initiating a signal to determine the location of the **Target Cell Phone** on Service Provider's network or with such other reference points as may be reasonably available.

## Cell-Site Data

42. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **Target Cell Phone**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information

for various business-related purposes.

**E-911 Phase II / GPS Location Data**

43. I know that some providers of cellular telephone service, including Service Provider, have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

44. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

45. I also know that certain wireless providers, such as Service Provider, can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

46. Based on my training and experience, I know that Service Provider also can collect

per-call measurement data, which Service Provider also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

47. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **Target Cell Phone**, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available.

**Pen-Trap Data**

48. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

**Subscriber Information**

49. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal

course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **Target Cell Phone** user or users and may assist in the identification of co-conspirators.

50. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **Target Cell Phone's** user or users, the locations of that user or users, and the patterns of that user or users. A frequency analysis of the telephone communications between MCFARLAND and other identified and unidentified subjects is material, in that it can establish whether the calls described above are a deviation from their normal patterns of communication. The frequency analysis of the locations associated with the cellular devices can establish whether the locations are deviations or consistent with normal patterns. This information is relevant to show whether MCFARLAND and others acted-in-concert, by establishing the nature and extent of their relationship, the existence and scope of the conspiracy, the pattern of their communications, their patterns of travel, and any deviations from those patterns.

**AUTHORIZATION REQUEST**

51. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

52. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

53. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

54. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until April 29, 2026, pursuant to the Omnibus Order signed by Honorable Judge Stephen C. Dries on April 29, 2025. This investigation is expected to remain covert at least until then, so disclosing the warrant would alert targets or subjects about the existence of a federal investigation. This investigation targets a sophisticated drug trafficking organization with multiple targets, subjects, and witnesses. Case agents will continue to request the same notification deadline for all warrants in this investigation, so that the notifications can be coordinated or extended as necessary. A single notification date will reduce the administrative burden on case agents and the Court, minimize the risks of disclosure, and promote judicial economy. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phone 9**

would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

55. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phone** outside of daytime hours.

## ATTACHMENT A

**Property to Be Searched**

**MATTER NUMBER 2024R438**

1. Records and information associated with the cellular device assigned telephone number **414-850-1859** ("**Target Cell Phone 2**"), whose service provider is Verizon (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 1095 Avenue of the Americas, New York, NY 10036.

2. **Target Cell Phone**.

## ATTACHMENT B

**Particular Things to be Seized**

**MATTER NUMBER 2024R438**

**I. Information to be Disclosed by the Service Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone** for the period from October 1, 2025, to present:

i. Names (including subscriber names, usernames, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long-distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phone**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from the **Target Cell Phone** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone** will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **Target Cell Phone**.

c. Information about the location of the **Target Cell Phone** for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall

compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

**II.** This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**III. Information to be Seized by the Government**

All information described above in Section I that constitutes evidence and instrumentalities of d distribution and possession with intent to distribute controlled substances, conspiracy to distribute and possess with the intent to distribute controlled substances, and use of a communications facility to facilitate a drug-trafficking offense, violations of Title 21, United States Code Sections 841(a)(1), 843, and 846 (Target Offenses), have been committed by George C. MCFARLAND (XX/XX/XX84), and other known and unknown individuals during the period of October 1, 2025 to present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this warrant.